IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KELON MICHEAL WILLIAMS,

    Petitioner,                   No. CIV S-04-2284 GEB DAD P

  vs.

D. L. RUNNELS, et al.,

    Respondents.              FINDINGS & RECOMMENDATIONS

                     /

        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a judgment of conviction entered against him on June 20, 2002 in the El Dorado County Superior Court on a charge of second degree murder. He seeks relief on the grounds that his conviction was obtained through a confession that resulted from an unlawful custodial interrogation. This action is proceeding upon the second amended petition filed on July 20, 2005 (hereinafter Pet.). Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

/////

/////

/////

1

PROCEDURAL AND FACTUAL BACKGROUND[1]

Kelon Michael Williams appeals from a judgment of imprisonment following a jury verdict convicting him of the second degree murder of his friend Jason Barnes. This is the second appeal in these proceedings.

Defendant was originally convicted of first degree murder. That conviction was reversed by this court[2] due to the erroneous admission into evidence of a police confession taken in violation of his Miranda rights. (Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694] (Miranda).)

At the second trial, defendant's confession to the police was excluded but a subsequent confession, made to his girlfriend, Rachel Webb,[3] upon her arrival at the police station, was admitted into evidence. Defendant now claims the confession to his girlfriend should not have been admitted and that allowing the jury to hear it constituted prejudicial error. We disagree and shall affirm the judgment.

BACKGROUND

Facts of the Crime

A detailed recitation of the evidence at trial is unnecessary to the resolution of the sole issue on appeal, i.e., the admissibility of defendant's statements to his girlfriend.

Defendant was convicted of murdering his close friend Jason Barnes after Barnes stole money from defendant's former girlfriend, Deborah Foster, and threatened Foster's physical safety. On the evening of the murder, defendant arranged to borrow a .22-caliber gun and ammunition, stating that he needed it for "protection" and was going to "scare some guy off" who was "messing" with his girlfriend.

---

[1] The following summary is drawn from the December 19, 2003 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), lodged on May 13, 2005 as "Lodging Document 3." This court presumes that the state court's findings of fact are correct unless petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004). Petitioner has not attempted to overcome the presumption with respect to the events underlying his conviction. The court will therefore rely on the state court's recitation of the facts.

[2] Our opinion reversing defendant's first appeal (People v. Williams (Nov. 27, 2001, C036136) [nonpub. opn.] (hereafter Williams I )) is included in the record of this appeal.

[3] For the sake of clarity, and out of no disrespect, we shall refer to defendant's girlfriend by her first name, Rachel.

Shortly before 2:00 a.m. defendant met Barnes at the apartment of an acquaintance for the ostensible purpose of giving Barnes a ride home. They left just after 2:00 a.m. Defendant returned home between 2:30 and 3:00 that morning.

Barnes's lifeless body was discovered on Highway 49 by a passing motorist around 3:00 a.m. A passenger in that vehicle called 911 and testified at trial.

The body was still warm when the crime scene was investigated by detectives between 4:30 and 5:00 a.m. Barnes had been killed by three gunshot wounds to the head from a .22 caliber gun.

Defendant later told the man from whom he had borrowed the .22-caliber that he had to "ditch" the gun.

Facts Relating to the Confession to Rachel

On May 25, 1999, defendant was arrested and brought to the police station for questioning by crime scene Detectives Tom Hoagland and Paul Moschini. After being read his Miranda rights, defendant made certain statements, which this court later held constituted an invocation of his constitutional right to have an attorney present during questioning. (See Edwards v. Arizona (1981) 451 U.S. 477, 484-485 [68 L.Ed.2d 378] (Edwards).)[4] Defendant thereafter made a full confession to the police, describing the murder in detail.

During the police interview, but before deciding to speak about the murder, defendant asked: "When we're done could you call Rachel so she come [sic] down here and so I can just see ... say good-bye to her before you guys take me over to the jail? I mean . . . . ." Detective Hoagland responded, "I will do that. I give you my word. I will call her."

After defendant admitted killing Barnes, the detectives suggested they go to defendant's car to check for evidence, prompting the following exchange:

"KELON [Defendant]: . . . Man I want, I want to see my girlfriend before you guys take me over there.

"MOSCHINI: We'll do that. We'll do that.

"KELON: You guys promise?

---

[4] In Williams I, our dissenting justice concluded that defendant's references to his attorney were equivocal; that the officers had the right to continue questioning under Davis v. United States (1994) 512 U.S. 452, 458-459 [129 L.Ed.2d 362, 371]; and that the confession to the police was therefore properly admitted.

3

"HOAGLAND:  Oh, yeah, I'm gonna call her right now."

After Hoagland telephoned Rachel, the following dialogue took place:

"HOAGLAND:  Okay, Rachel is on her way, all right?  Hey, do you feel a little better?  You got a little bit off your chest.  Now listen to me Kay,[5] Rachel is on her way.  I didn't tell her anything. I just said...."

"KELON:  I'm gonna have to tell her myself.

"HOAGLAND:  All right.  You want a glass of water?

"MOSCHINI:  Do you want to tell her or do you want us to tell her?

"HOAGLAND:  I think it'd be better if it comes from you.

"KELON: (Crying) . . ."

Before Rachel arrived, the following exchange occurred:

"KELON:  I just want to talk to, you know, I just want to talk to Rachel.

"MOSCHINI:  She's coming.  She's coming.

"KELON:  Let her know what's going on. (Crying.) . . . (Inaudible)."

Rachel was then brought into the interrogation room and was left alone with defendant, who began crying "I'm sorry. I'm sorry." Rachel replied, "Tell me what happened.  Come here.  Come here.  Tell me what happened," whereupon defendant made a full confession of the crime to her.

At the retrial of this case, defendant's confession to the police was suppressed, but the prosecution moved to admit defendant's subsequent statements to Rachel.  Before making its ruling, the court viewed excerpts from the videotape of defendant's interview with detectives Hoagland and Moschini.  Over defendant's objection, the court permitted the jury to watch the videotape of the

/////

/////

---

[5]  Throughout the transcript of the interview, the detectives address defendant by the nickname "Kay."

4

conversation between defendant and his girlfriend in which he admitted shooting Barnes.

(Opinion at 1-5.)

The state court record also reflects that when Rachel came to the police station to speak with petitioner, the following colloquy occurred:

> RACHEL: Did you kill him? Did you?
>
> [PETITIONER]: I was scared.
>
> RACHEL: Did you? You did?
>
> [PETITIONER]: (Crying . . . inaudible) . . . That's the only reason. Because he kept on saying he was gonna come up there and kill everybody. And blow up the house.
>
> * * *
>
> RACHEL: Why, Kay?
>
> [PETITIONER]: I was scared Rachel. I was scared.
>
> RACHEL: Of what?
>
> [PETITIONER]: Because I seriously thought he was gonna come to the fucking house, man, I seriously did.
>
> RACHEL: So you shot him?
>
> [PETITIONER]: I seriously did.
>
> RACHEL: And you shot him?

(Clerk's Transcript on Appeal (CT) at 886-87.)

In ruling on petitioner's motion to suppress his statements to Rachel, the trial court made the following observation:

> All right. It seems to me that the officers were quite concerned about not telling Rachel anything unless Mr. Williams wanted them to. They seemed to be quite concerned about that, and it does appear from the evidence that the Court can find, based upon what I've heard on the videotape and listening, that there is no evidence that they did tell her.

/////

5

> So based upon all of those circumstances, the fact that it was his request to see her and that the officers were careful not to tell her anything that Mr. Williams did not want her to know, it seems to me that his statement to her would be admissible.

(Reporter's Transcript on Appeal (RT) at 138-39.)

## ANALYSIS

I. <u>Standards of Review Applicable to Habeas Corpus Claims</u>

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. <u>See</u> <u>Peltier v. Wright</u>, 15 F.3d 860, 861 (9th Cir. 1993); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000); <u>Middleton</u>, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues <u>de</u> <u>novo</u>. <u>Milton v. Wainwright</u>, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997); <u>Clark v. Murphy</u>, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

/////

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo. Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

II.  Petitioner's Claim

Petitioner claims that his inculpatory statements to his girlfriend, Rachel Webb, should have been suppressed because they were, in effect, a continuation of the prior unlawful interrogation by the police. He argues that his statements to Rachel and his confession to police were "part of the same package" and were "one event." (Pet. at consecutive p. 7; Traverse at 5.) Petitioner also contends that he would not have made the statements to Rachel if he had not already confessed to the crime. (Pet. at consecutive p. 7)  Petitioner presented this argument to the California Court of Appeal, which rejected it in a reasoned decision dated December 23, 2003. (Lodging document 3.)  The California Supreme Court summarily denied review by order dated March 17, 2004. (Lodging document 5.)

In his reply brief on appeal, petitioner raised the same argument he is making to this court - that his statements to Rachel resulted from a continuing unlawful police interrogation. (Opinion at 10.)  In his opening brief on appeal, petitioner raised an argument not raised here - that his statements to Rachel were "tainted" by the prior unlawful confession to the police.

7

(Lodging document 1.)  The California Court of Appeal rejected both arguments, reasoning as follows:

> Defendant contends his confession to Rachel Webb should have been suppressed as the "product of the Miranda violation." Inasmuch as his earlier confession to the detectives was ruled inadmissible as a violation of Edwards following an invocation of his right to counsel, defendant maintains the second confession was "inextricably tied" to the first one, is presumed to be the product of the same coercive influence, and was therefore similarly tainted.
>
> Defendant's argument partakes of the "'fruit of the poisonous tree'" analysis developed in Wong Sun v. United States (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 455] (Wong Sun).)  Under Wong Sun, whenever evidence and witnesses are discovered as the result of a search in violation of the Fourth Amendment, those "fruits" must be suppressed as well.  (See Oregon v. Elstad (1985) 470 U.S. 298, 306 [84 L.Ed.2d 222, 230] (Elstad).)  As the United States Supreme Court explained in Elstad, the doctrine also applies where a confession is obtained through custodial interrogation after an illegal arrest.  The confession must be suppressed unless the intervening events break the causal connection, such that the "taint" has been purged.  (Ibid.)
>
> The Miranda exclusionary rule, however, which serves the Fifth Amendment privilege against self-incrimination, "sweeps more broadly than the Fifth Amendment itself."  (Elstad, supra, 470 U.S. at p. 306 [84 L.Ed.2d at p. 230].)  The rule requires the exclusion of statements which, even though voluntary, have been elicited in violation of the warning requirement.  "But the Miranda presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted."  (Id. at p. 307 [84 L.Ed.2d at p. 231], italics added.)  Thus, if a statement made inadmissible by Miranda is otherwise voluntary, constitutional jurisprudence does not require suppression of its "fruits."  (Ibid.)
>
> This reasoning "applies with equal force when the alleged 'fruit' of a noncoercive Miranda violation is neither a witness nor an article of evidence but the accused's own voluntary testimony."  (Elstad, supra, 470 U.S. at p. 308 [84 L.Ed.2d at p. 232].)  In other words, where a confession taken in violation of Miranda rights is followed by a subsequent confession, the admissibility of the second turns not on whether it was "tainted" by the first, but simply whether it was voluntary.  (Elstad, at pp. 307-308, 312 [84 L.Ed.2d at pp. 231, 234].)  Or, as the California Supreme Court recently rephrased it, "[w]here a prior custodial statement, though obtained without Miranda warnings, was otherwise uncoerced, any taint upon a second statement is dissipated by a determination that the second

8

statement was itself voluntary and obtained without a Miranda violation." (People v. Storm (2002) 28 Cal.4th 1007, 1030, 124 Cal.Rptr.2d 110, 52 P.3d 52 (Storm) citing Elstad, supra, 470 U.S. at pp. 310-311 [84 L.Ed.2d at pp. 233-234].)

Here, defendant's confession to the police was found by this court to be inadmissible by virtue of the Edwards extension of Miranda which requires officers to cease interrogation once the accused invokes his right to counsel. However, for purposes of constitutional analysis, a confession which is the product of an Edwards violation stands in the same posture as a confession elicited without proper Miranda warnings. While both are made inadmissible in the prosecution's case-in-chief by Miranda's prophylactic remedy, neither is involuntary as a matter of law. (People v. Bradford (1997) 14 Cal.4th 1005, 1039, 60 Cal.Rptr.2d 225, 929 P.2d 544 (Bradford ) ["[J]ust as a failure to give Miranda warnings does not in and of itself constitute coercion ([Elstad], supra, 470 U.S. at p. 307, fn. 1 [84 L.Ed.2d at pp. 230-231] ), neither does continued interrogation after a defendant has invoked his right to counsel, or an Edwards violation, inherently constitute coercion"].)

We find nothing in the record which would lead us to conclude that defendant's initial confession to Detectives Hoagland and Moschini was involuntary. Throughout the interview, Detectives Hoagland and Moschini were respectful and accommodating. Nothing in the transcript indicates that defendant succumbed to the influence of coercive police tactics.

Accordingly, defendant's confession to Rachel cannot be excluded on the basis that it was "tainted" by his earlier statements to the police.[6] Suppression of defendant's statements to his girlfriend was

---

[6] The fact that defendant's first confession was the product of a noncoercive Miranda violation distinguishes this case from People v. Dingle (1985) 174 Cal. App. 3d 21, 219 Cal. Rptr. 707 ( Dingle ), the primary case relied upon defendant. In Dingle, the police extracted a coerced confession after the defendant asked for a lawyer. (Id. at pp. 25-27, 219 Cal. Rptr. 707.) The Court of Appeal upheld the trial court's finding that the confession was involuntary and then proceeded to apply a "taint" analysis to conclude that a second confession should not have been admitted because there was no "break in the causative chain" between the two confessions. (Id. at pp. 27-28, 219 Cal. Rptr. 707.)

Dingle applies the principle that where an initial involuntary confession is followed by a second uncoerced one, it must be shown that the "taint" of the first has been attenuated in order to achieve admission of the second. (People v. Badgett (1995) 10 Cal. 4th 330, 348, 41 Cal. Rptr. 2d 635, 895 P.2d 877; People v. Jimenez (1978) 21 Cal. 3d 595, 614, 147 Cal. Rptr. 172, 580 P.2d 672.) However, as we have shown, such an analysis has no place in determining the admissibility of a second confession, which follows one rendered inadmissible solely by virtue of a Miranda or Edwards violation. (See Storm, supra, 28 Cal. 4th at pp. 1031-1033, 124 Cal. Rptr. 2d 110, 52 P.3d 52.)

proper only if they were either (1) made involuntarily or (2) obtained in violation of Miranda. (Storm, supra, 28 Cal.4th at p. 1030, 124 Cal.Rptr.2d 110, 52 P.3d 52.) We examine each alternative.

1. Voluntariness

We dismiss defendant's claim that the statements to Rachel were involuntary because he was "crying and distraught." "A finding of coercive police activity is a prerequisite for a finding that a confession was involuntary under the due process clauses of the federal or the state Constitution." (People v. Mayfield (1997) 14 Cal.4th 668, 759, 60 Cal.Rptr.2d 1, 928 P.2d 485 (Mayfield) citing, inter alia, Colorado v. Connelly (1986) 479 U.S. 157, 167 [93 L.Ed.2d 473, 484-485].) Rachel was called to the police station at defendant's behest. There is no evidence of collusion between her and the officers. Accordingly, there is no basis for concluding that defendant's statements to his girlfriend were coerced.

2. Miranda Violation

Having apparently realized that a Wong Sun-type argument will prove fruitless, defendant switches themes in his reply brief. He argues that his conversation with Rachel was a continuation of the original interrogation by the detectives in which defendant had invoked his right to counsel, and therefore excludable as a Miranda violation. This argument echoes defense counsel's claim that the Webb conversation was "part and parcel of [defendant's] whole confession [to police]."

In rejecting defense counsel's "part and parcel" argument, the trial court made an implied finding that the conversation between Rachel and defendant did not constitute a continuation of the police interrogation. We review the trial court's finding as to whether interrogation occurred for "substantial evidence or clear error." (Bradford, supra, 14 Cal.4th at p. 1035, 60 Cal.Rptr.2d 225, 929 P.2d 544.)

Defendant attempts to draw fuel for his argument from Rhode Island v. Innis (1980) 446 U.S. 291 [64 L.Ed.2d 297] (Innis), wherein the federal Supreme Court held that "the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." (Id. at pp. 300-301

[64 L.Ed.2d at pp. 307-308], fns. omitted, italics added.) Defendant reasons that the interrogation did not end when Rachel entered the room "because the officers knew it was reasonably likely [defendant] was going to repeat his unlawfully-obtained confession to her." Therefore, according to defendant, allowing Rachel to speak with him constituted the "functional equivalent" of interrogation. Case law does not support defendant's position.

In Arizona v. Mauro (1987) 481 U.S. 520 [95 L.Ed.2d 458] (Mauro) the defendant Mauro was taken into custody and read his Miranda rights. He refused to answer any questions until a lawyer was present. Mauro's wife, who was being questioned in another room, asked to speak with him. The officers brought Mrs. Mauro into the interrogation room and turned on a tape recorder. Mauro then made incriminating statements to his wife, which the prosecution later sought to introduce at trial. Relying on Innis, the Arizona Supreme Court ruled the statements were inadmissible. It reasoned that allowing Mauro to speak with his wife was the "functional equivalent" of interrogation because the officers knew that "if the conversation took place, incriminating statements were likely to be made." (Mauro, at pp. 524-525 [95 L.Ed.2d at pp. 464-465].)

The United States Supreme Court reversed. Pointing out that the request to see Mrs. Mauro came from Mauro himself and that there was no evidence that the officers allowed the visit for the purpose of eliciting incriminating statements or as a coercive tool to extract information, the high court concluded: "Officers do not interrogate a suspect simply by hoping that he will incriminate himself . . . . [¶] . . . [¶] . . . Mauro was not subjected to compelling influences, psychological ploys, or direct questioning. Thus, his volunteered statements cannot properly be considered the result of police interrogation." (Mauro, supra, 481 U.S. at p. 529 [95 L .Ed.2d at p. 468].)

In Mayfield, detectives placed defendant Mayfield in an interview room and read him his Miranda rights. He refused to waive them and requested a lawyer. (Mayfield, supra, 14 Cal.4th at p. 757, 60 Cal.Rptr.2d 1, 928 P.2d 485.) Mayfield then asked to see his father. The detectives allowed the father into the room, and recorded their conversation with a hidden microphone. (Ibid.) On appeal Mayfield, citing Innis, contended that placing the father in the interview room alone with him constituted a form of custodial interrogation because it was "conduct that was 'reasonably likely to elicit an incriminating response.'" (Mayfield, at p. 758, 60 Cal.Rptr.2d 1, 928 P.2d 485.) The California Supreme Court breezily dismissed the claim, in the following language: "We reject this argument 'because it is clear that defendant's conversations with his own visitors are not the constitutional equivalent of police interrogation.' [Citations.] This is particularly true here because defendant had specifically and repeatedly asked

11

> to be allowed to speak with his father.  The meeting occurred on defendant's initiative, not that of the police.  Granting defendant's request cannot be equated with custodial interrogation." (Ibid., quoting People v. Gallego (1990) 52 Cal.3d 115, 170, 276 Cal.Rptr. 679, 802 P.2d 169, italics added.)
>
> Mauro and Mayfield closely parallel the facts of this case and compel rejection of defendant's claim that the conversation with his girlfriend constituted a continuation of custodial interrogation by detectives.  It was defendant's repeated requests that brought Rachel to the police station.  The detectives had no motive to enlist her assistance since they already had a full confession at hand.  There is nothing to support the suggestion that Rachel was used as either a witting or unwitting tool of the police.  In fact, she was not even told, prior to seeing defendant, that he had confessed his crime to the officers.
>
> Finally, even if the detectives permitted Rachel to speak to defendant in the hope or expectation that he would repeat his confession to her, such conduct did not convert the conversation into an interrogation.  This is especially true in light of the United States Supreme Court's admonition that any inquiry as to whether constructive interrogation occurred "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." (Innis, supra, 446 U.S. at p. 301 [64 L.Ed.2d at p. 308], italics added.)  From defendant's viewpoint, he was having a private conversation with his girlfriend about a horrible secret which had been torturing him.  None of the elements of official compulsion was present.
>
> We conclude the trial court did not err in refusing to exclude defendant's statements to Rachel.

(Opinion at 5-13.)

A. Applicable Law

"The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966).  To this end, custodial interrogation must be preceded by advice to the potential defendant that he has the right to consult with a lawyer, the right to remain silent and that anything he says can be used in evidence against him. Id. at 473-74.  When, as in this case, a suspect invokes his right to counsel, "[he] is not subject to further interrogation by the authorities

until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). If the police continue the interrogation after a defendant has invoked his right to counsel, any resulting confession or statement must be suppressed. Rhode Island v. Innis, 446 U.S. 291, 297-98 (1980).

Since Miranda warnings are required only in the situation of a custodial interrogation, several courts have addressed the question of when a person has been "interrogated" for purposes of Miranda. These cases have recognized that while interrogation usually takes the form of direct questioning, there are situations where interrogation can occur through indirect means. In Rhode Island v. Innis, the United States Supreme Court held that "interrogation" consists of both express questioning by the police and also "its functional equivalent." 446 U.S. at 301. The term "functional equivalent" was defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. The "functional equivalent" test "focuses primarily upon the perceptions of the suspect, rather than the intent of the police;" – that is, whether the suspect would conclude that he was being subject to a custodial police interrogation. Id.[7]

Under certain circumstances, questioning by third parties may result in "the functional equivalent" of police interrogation. For instance, in Arizona v. Mauro, 481 U.S. 520, 528 (1987), the defendant argued that he was subject to interrogation when the police allowed him to speak with his wife in the presence of a police officer. Id. at 527. The Supreme Court

---

[7] In Innis, after the suspect requested a lawyer, three officers placed him in a police car and drove him to the police station. On the way, two of the officers engaged in a conversation concerning the missing shotgun, which prompted the suspect to show them where the gun was located. The Supreme Court held this was not interrogation because there was no express questioning and it could not be said that the officers should have known their conversation was reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 302 (1980).

concluded that Mauro's conversation with his wife did not constitute interrogation because Mauro "was not subjected to compelling influences, psychological ploys, or direct questioning," and there was no evidence that "the officers sent Mrs. Mauro in to see her husband for the purpose of eliciting incriminating statements." Id. at 528.  Although the officers were aware that Mauro might incriminate himself during the conversation with his wife, the Supreme Court concluded that "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." Id. at 529.  In United States v. Kimbrough, 477 F.3d 144, 151 (4th Cir. 2007), the court held that the police did not subject the defendant to improper interrogation when they brought defendant's mother to the basement to see drugs stored there because there was "no evidence in the record of a tacit agreement, discussion, or understanding between the police officers and defendant's mother that she would ask questions or attempt to elicit incriminating information."[8]

B. Analysis

Petitioner argues that he was subject to the "functional equivalent" of interrogation when he confessed to Rachel because the police expected and intended that he would repeat his earlier confession. (Pet. at 5.)  Petitioner notes that Detective Hoagland told him it would be "better if [petitioner's explanation of the events] comes from you." (Traverse at 9.)  Petitioner explains:

> The unlawful interrogation continued because the officers knew it was reasonably likely petitioner was going to repeat his unlawfully obtained confession to her. Allowing petitioner to speak with his girlfriend was clearly the functional equivalent of an interrogation because the detectives knew their actions were reasonably likely to elicit incriminating evidence.

Id.)

---

[8] The court in Kimbrough could find no cases "in which statements or confessions elicited through private questioning have been suppressed." United States v. Kimbrough, 477 F.3d 144, 150 (4th Cir. 2007).

14

In <u>Mauro</u>, the Supreme Court stressed that the purpose of <u>Miranda</u> is to "prevent [] government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." 481 U.S. at 529-530. For coercion to be present, the suspect must perceive that the pressure to speak is emanating from the police. <u>Id.</u> Here, there is no evidence that petitioner felt coerced by police conduct. This is not a case in which private questioning was given the stamp of official authority, <u>see</u>, <u>e.g.</u>, <u>Estelle v. Smith</u>, 451 U.S. 454, 467 (1981) (questioning by court-appointed competency psychiatrist implicated defendant's <u>Miranda</u> rights) nor in which government officials forced a suspect to answer a third party's questions. <u>See</u>, <u>e.g.</u>, <u>Wilson v. O'Leary</u>, 895 F.2d 378, 380-81 (7th Cir. 1990) (holding <u>Miranda</u> applicable where sheriff detained defendant against his will in a vacant lot so husband of victim could interrogate him). <u>See</u> also <u>Endress v. Dugger</u>, 880 F.2d 1244, 1248-49 (9th Cir. 1989) (detective who was close friend of defendant and visited defendant to inquire on his well-being rather than at direction of officer connected with investigation did not subject defendant to "functional equivalent of interrogation," and thus, statements made by defendant to detective were not obtained in violation of <u>Miranda</u>); <u>United States v. Gaddy</u>, 894 F.2d 1307, 1311 (11th Cir. 1990) (suspect in custody was not interrogated when aunt, who was employed by the police department, urged him to tell police what he knew about a crime); <u>Snethen v. Nix</u>, 885 F.2d 456, 457 (8th Cir. 1989) (suspect in custody was not interrogated when he confessed after a conversation with his mother, who had told police before the conversation that "if [my son] did this, he will tell me.").

Here, petitioner spoke to Rachel voluntarily and at his own request. Rachel questioned petitioner on her own initiative and with no scripting or encouragement from the police. In this regard, Rachel's immediate questions to petitioner, set forth above, make clear that she had not been forewarned about what petitioner had told the police but instead was shocked at petitioner's admission that he killed Barnes. Because the police never told petitioner

/////

he had to speak to Rachel and because he requested her presence, he cannot plausibly contend he was coerced into answering her questions.

After a thorough review of the record, this court concludes that petitioner's confession to Rachel was not the result of police interrogation but was simply a voluntary statement which was thereby admissible at his trial. See Miranda, 384 U.S. at 478 ("volunteered statements of any kind are not barred by the fifth amendment"). Petitioner is correct that this case is unique in that the police obtained a confession in violation of Edwards before he made his statements to Rachel. In addition, it is apparent that the police knew petitioner intended to tell Rachel that he shot Barnes. Nevertheless, the conversation between petitioner and Rachel "cannot properly be considered the result of police interrogation." Mauro, 481 U.S. at 529. Certainly, there is no evidence the police arranged for Rachel to come to the jail "for the purpose of eliciting incriminating statements." Mauro, 481 U.S. at 528. Rather, as the state appellate court found, petitioner himself insisted on speaking with Rachel. Indeed, the police had no incentive to use Rachel to obtain incriminating statements because petitioner had already confessed. In his exchange with Rachel, petitioner was not subjected to "compelling influences" of any kind, "psychological ploys," or direct questioning from police. Id. at 529. Under these circumstances, the fact that the police believed petitioner would repeat his confession to Rachel, and that petitioner's previous confession was obtained in violation of Edwards, does not make petitioner's conversation with Rachel the functional equivalent of police interrogation. See Cobb v. Kernan, No. 2:04-cv-1299 JKS EFB, 2008 WL 110995, *3 (E.D. Cal. Jan. 9, 2008) (denying habeas relief where the challenged statement was given to petitioner's girlfriend who was allowed by police to speak with him at her request); Hovey v. Calderon, No. C 89-1430 MHP, 1996 WL 400979, *29 (N.D. Cal. July 10, 1999) ("Thus, if petitioner had made inculpating statements to his father even in response to his father's questions, the statements would be admissible and not in violation of petitioner's Fifth Amendment rights unless his father was

/////

being used by the government for this purpose [] even if the statements are known by petitioner to be monitored.")

In sum, the police in this case did not engage in the functional equivalent of interrogation when they acceded to petitioner's request to talk with Rachel. Accordingly, petitioner's voluntary statements to Rachel were admissible at his trial. The decision of the California Court of Appeal rejecting petitioner's claim is not contrary to or an unreasonable application of federal authority as set forth above and should not be set aside.

## CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: September 26, 2008.

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8
williams2284.hc